FILED

AUG 1 2005

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
            DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

DEBORAH OSBORN,
      Plaintiff,

Vs.

                                              CIVIL ACTION
                                              NO. A 04 CA 158 LY

COMPUTER SCIENCES
CORPORATION, Et Al.
      Defendants.

## PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE ROBERT PITMAN

TO THE HONORABLE LEE YEAKEL, UNITED STATES DISTRICT JUDGE:

      Plaintiff Deborah Osborn makes the following objections to the Report and

Recommendation of the United States Magistrate Judge Robert Pitman, signed on July 8, 2005

("R & R"):

1.      When a party objects to a United States Magistrate's Report and Recommendation, the

district judge is to "make a de novo determination" of the merits of the underlying motion.  Fed.

R. Civ. P. 72(b); 28 U.S.C. § 636(b).  The term "de novo" signifies that the magistrate's findings

are not protected by the clearly erroneous doctrine..." Advisory Committee Notes to Fed. R. Civ.

P. 72.

2.      The specific recommendations to which Plaintiff objects are stated in part IV of the

Report and Recommendation and are those in which the U.S. Magistrate Judge recommends that

the District Court should:

      (A) grant Defendants' Motion for Summary Judgment (Clerk's Dkt. #26); and,

      (B) deny Plaintiff's Motion to Amend Complaint (Clerk's Dkt. #23).

3.      The recommendation that the District Court grant the Defendant's Motion for Summary

Judgment is erroneous because there are disputed factual issues that only a finder of fact may

resolve, because defendants are not entitled to judgment as a matter of law, and because to rule otherwise would be clearly erroneous.  Snapshots of several disputed issues of material fact issues are:

i)  There is a factual dispute between CSC management executives about the criteria used to select which sales people would be considered for dismissal as part of a reduction in force ("RIF") by CSC in March 2003.  Defendant Tim Fisher made the decision to dismiss Deborah Osborn (the only female enterprise-level sales representative) in March 2003; and she was the sole salesperson he selected to be released from CSC's Property & Casualty Group ("P & C Group") in the RIF.  Mr. Fisher testified that his boss, Ray August, President of the Property and Casualty group, specifically instructed him to release an "enterprise-level" salesperson in the RIF. [*See* Exh. B, FISHER DEPO. 53:1-17, 54:7-18].  By contrast, Mr. August testified he gave no such instruction, and testified he simply told Mr. Fisher to reduce his sales force and left it totally up to Mr. Fisher to determine which of his managers and which of their sales people would be affected by the layoffs [*See* Exh. C, AUGUST DEPO., 106:25 - 107:18]. There is another factual dispute raised by a conflict in testimony between Mr. Fisher and the manager who directly supervised Mrs. Osborn, Brooke Carter, about how Deborah Osborn came to be selected for layoff.  Mr. Fisher testified that, "... I decided to contact Brooke Carter to say I need you to do an assessment of your team specifically related to Deborah. I may have told him there was a reduction in force or not, but I said I need to have you do this fairly quickly." [*See* Exh. B, FISHER DEPO. Vol. I 137:12-16.]  Brooke Carter's testimony contradicted the testimony of Tim Fisher quoted above.  [*See* Exh. D, CARTER DEPO.  Vol. II 150:6 - 151:2.]  This conflict in testimony raises a fact issue about whether the selection criteria used to particularly scrutinize and consider only a very small group of salespeople under a single supervisor was a pretextual basis intended to result in the dismissal of Deborah Osborn, the sole female sales person in that

limited group, rather than considering all sales people in the P&C group for possible release. The fact that at least one male sales-support employee with no track record as a CSC outside sales person was simultaneously moved into a sales position that was not disclosed to Deborah Osborn and for which she was not allowed to compete, raises a fact issue as to whether there was any need for a sales person to be laid off at all. *See* Exhibit E, being filed herewith, documents from the personnel file of a male employee named Clark Lowry, that show his transfer from a sales-support position into a direct sales position in CSC's Property & Casualty group simultaneously with Mrs. Osborn's selection for release from her sales position in CSC's so-called "RIF." [The employee's Social Security Number has been redacted from this Exhibit per standing orders of this Court].

ii) There is a factual dispute bearing on a central fact in Mrs. Osborn's complaint of retaliatory discharge by Tim Fisher.  Mrs. Osborn testified Mr. Fisher told her not to speak with Debi Stafford, CSC's VP Human Resources, and if she did so she could lose her job. [*See* Exh. F, OSBORN DEPO. Vol II 210:24 - 211:16.]  Mr. Fisher denies he had forbidden Mrs. Osborn to speak with Mrs. Stafford, claiming he only warned Mrs. Osborn not to talk with CSC's Human Resources VP about a particular subject. [*See* Exh. B, FISHER DEPO. Vol. II 153:25 - 154:25].  Debi Stafford corroborates Mrs. Osborn's testimony about Fisher's warning to her. [*See* Exh. G, STAFFORD DEPO. Vol. I 51:13 - 54:19.].  Mr. Fisher also claims he did not know Mrs. Osborn met with Debi Stafford after his admonition and just a few weeks before he dismissed her. [*See* Exh. B, FISHER DEPO. Vol. II 155:17-20].  That claim is controverted by the testimony of Debi Stafford. [*See* Exh. G, STAFFORD DEPO. Vol. I 53:17 - 54:19].  Mrs. Osborn contends that her meeting with Mrs. Stafford was protected activity in which issues of inequity in the payment of commissions as between herself and a male sales rep were discussed, and that meeting subjected her to retaliation by Mr. Fisher.  Mrs. Stafford's contradiction of Tim Fisher's claim that he knew

nothing about their meeting supports a conclusion there very likely was retaliation and raises credibility issues about Mr. Fisher's real basis for the dismissal of Deborah Osborn. The conflicting testimony raises credibility issues about the alleged basis of Mrs. Osborn's selection for dismissal and would support a finding that the purported reasons are pretextual.

   iii) The underlying documents on which Brooke Carter, Mrs. Osborn's (male) supervisor, relied as the basis for part of his memo to Tim Fisher justifying dismissal of Deborah Osborn were destroyed just two or three weeks after the dismissal occurred on March 31, 2003. [*See* Exh. D, CARTER DEPO. Vol. II 89:9-25, 93:1-3]. Such document destruction violates regulatory guidelines promulgated under Title VII and the Americans with Disabilities Act by the Equal Employment Opportunity Commission for employer recordkeeping. See, 29 CFR 1602.14, stating, in part:

29 CFR § 1602.14 -- Preservation of records made or kept.
Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. ...

Intentional destruction by her manager of documents that provided part of the purported basis for dismissing Mrs. Osborn just 2 or 3 weeks after her termination would obviously not comply with the regulation. [*See* Exh. D, CARTER DEPO., Vol. II at 92:3 - 93:3.]. Such document destruction, violating an applicable federal regulation intended to require record preservation for later review in discrimination claims, raises a fact issue about whether the documents would have supported the justification for Mrs. Osborn's dismissal if they had been preserved; and such rapid destruction of the documents could be seen by a jury as evidence that a dismissal purportedly based on such documents was pretextual. *See, e.g., Templet v. Hard Rock Constr. Co.,* 2003 U.S. Dist. LEXIS 1023 (Dist. Ct. E. Dist. La. 2003), (holding, *inter alia*, that

employer's failure to maintain records required by law may shift the evidentiary burden to the employer and may preclude summary judgment in employer's favor as a matter of law). A party's destruction of a relevant document is evidence from which a jury may infer that its contents would have been unfavorable to that party, if the destruction is intentional or wrongful. *See, Nation-Wide Check Corp., Inc. V. Forest Hills Distributors, Inc.*, 692 F.2d 214 (1st Cir. 1982); *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *Broomfield v. Texas General Indemnity Co.*, 201 F.2d 746, 749 (5th Cir. 1953). Document destruction in violation of an applicable, published document retention rule would be wrongful; and the manager who testified he disposed of the records did not claim their destruction was inadvertent or accidental. *See*, 29 CFR 1602.14; and Exh. D, CARTER DEPO. Vol. II 92:3 - 93:3. Moreover, there are CSC documents reflecting sales call activities by Mrs. Osborn with the customers assigned to her territory, showing that Mr. Carter's statements in his memo recommending her termination (Bates CSC 23401) about how few customer calls he claimed Mrs. Osborn had made were untrue (based, in turn, on the documents Mr. Carter disposed of). *See* attached Exh. A, Supplemental Affidavit of Deborah Osborn and CSC documentation attached thereto reflecting customer call activities by Mrs. Osborn that were the subject of several misrepresentations by Mr. Carter in his memo recommending that Ms. Osborn's employment be terminated.

iv) Tim Fisher was the decision maker who selected Deborah Osborn for transfer in July or August 2002 into a different sales unit, that being the third such transfer, change in assigned customer territory, and change in the CSC products and services she was authorized to sell, in a period of just 17 months in a marketplace in which knowledgeable CSC executives have admitted that the normal marketing cycle for new license sales is a long one, often requiring "several years". *See* Response to Motion for Summary Judgment ¶4 and related deposition excerpts from Deposition Transcript of John Hatcher attached to Response as Exhibit D. Such a

move, coming on top of earlier moves within the preceding 17 months that were not visited on her male counterparts, was calculated to and did cause Mrs. Osborn's short-term sales to diminish in a way that Mr. Fisher subsequently used to justify her dismissal. Once management worked their will on her by repeatedly transferring her, reassigning her territories, and changing the product and service offerings she was allowed to sell, and assigning "low-hanging fruit" territories that provided renewal commissions and sales quota credit to her male counterparts, a short-term lag in Mrs. Osborn sales was inevitable through no fault of her own. Prior to the sequence of such transfers, Mr. Fisher himself had previously identified Mrs. Osborn as his "best salesperson." *See* ¶ 4 of Plaintiff's Response to Defendants' Motion for Summary Judgment and Exhibit C thereto, containing excerpts from the Oral Deposition of Kelley Parker. Brooke Carter testified he solicited input from sales people under his supervision as to assignment of territories in July/August 2002. [*See* Exh. D, CARTER DEPO. 30:17 - 31:4.]. However, Mrs. Osborn was never given the opportunity for input that her male counterparts had. [*See* Response to Motion for Summary Judgment and the attached Supplemental Affidavit of Deborah Osborn, attached hereto as Exh. A.]

v)  In her oral deposition, Debi Stafford, CSC's Rule 30(b)(6) designee and Vice President, Human Resources, admitted "**there is no doubt**" that one of the documents stating CSC management's justification for the layoff of Deborah Osborn was "**untrue**." Please *see* ¶¶ 21 - 29  of Plaintiff's Response to Motion for Summary Judgment, and related Exhibits appended to the Response.  Subsequent deposition testimony and Ms. Stafford's "corrections" to her oral deposition transcript have given two separate and inconsistent explanations of the reasons for that testimony as (two different kinds of) typographical errors, attempting to explain away the unequivocal statements she made under oath in the first volume of her oral deposition. *See* ¶¶ 21 - 29  of Plaintiff's Response to Motion for Summary Judgment, and related Exhibits appended to

the Response.  Subsequently, in purported "corrections" made to her oral deposition transcript, Mrs. Stafford gave a second, different "typo" explanation, founded on the distinction between employee group 5 and group 7 in CSC's Property & Casualty division shown on certain documents which (mysteriously) had never been produced in response to Plaintiff's requests for production served on CSC with its original (state court) petition over a year before her deposition. [*See* Exh. L, which is Exhibit 18 from STAFFORD DEPO. Vol. III].  In the subsequent continuation of her deposition after making such corrections, Mrs. Stafford was asked if she could explain any reason why the documents allegedly supporting her second "typo" explanation had never previously been provided in response to plaintiff's requests for production, and Mrs. Stafford said she could not give any reason why that had occurred.  [*See* Exh. G, STAFFORD DEPO. Vol. III 221:5-13, 226:8-25, 227: 3-10].  The original testimony coupled with two inconsistent "explanations" given in an effort to diminish and discount the original testimony, coupled with the utter failure to tender the so-called explanatory documents previously and the absence of any explanation for previously withholding them, is ample to raise a fact issue about whether the explanation justifying Deborah Osborn's dismissal was pretextual.

vi) There is a disputed fact issue as to whether Deborah Osborn was really the lowest performer in  Brooke Carter's group. CSC's commission and sales data show that Mrs. Osborn was not the lowest performer in Brooke Carter's section with respect to new license sales during the period July 2002 through March 2003. *See* Exh. A, ¶ 7 of Supplemental Affidavit of Deborah Osborn attached hereto as Exhibit A, and Attachment B to her affidavit.  Attachment B to Mrs. Osborn's Supplemental Affidavit is a spreadsheet that contains solely CSC data from the CD produced by CSC in February 2005 and Bates numbered CSC 32972. The bottom part of Attachment B ("New License Commissions") shows that male employees Jon Biggs, Jack Norton and Jon Smith Jr. had lower new license revenue production and commissions than Mrs.

Osborn did during the period in FY 2003 when Mrs. Osborn was under Brooke Carter's supervision; and Tom Temple, Steve Pickworth and Glenn Hedgecock had higher new license revenue production and commissions than she did during that period.  This means that if CSC had used new license sales to determine who was the lowest performer (instead of using data tainted by renewal commissions generated by territory assignments instead of sales efforts), Mrs. Osborn would not have been inaccurately described as the lowest performer in the group. Given the low levels of new license sales shown in the bottom part of Attachment B, the top part of Attachment B ("USF" - Utilization and Support Fee) shows that Mrs. Osborn's male peers received the majority of their sales quota credit and commissions from renewal business that resulted primarily from their more favorable territory assignments consisting of existing clients with renewal opportunities, whereas Mrs. Osborn's renewal opportunities from territory assignments were extremely limited.  *See* Exh. A, Supplemental Affidavit of Deborah Osborn and Attachment B. The failure to use new license sales as the performance measure for selecting a candidate to be released in this RIF was inconsistent with the business justification that drove Property and Casualty Group's RIF, which was based on the lack of new business (new license sales) as the reason for the RIF.  *See* Exh. K, "Property & Casualty" paragraph, submitted herewith, and the related testimony of Debi Stafford, CSC's Rule 30(b)(6) designee [Exh. G, STAFFORD DEPO. Vol. I 67:8 - 68:20].

4.     Although it does not appear the Report and Recommendation denominated any of its contents as "findings" or in a way that necessarily requires specific objection, nevertheless in an abundance of caution, Plaintiff objects that the following comments, if intended as "findings", are erroneous and are contradicted by the pleadings and record before the Court, and Plaintiff Objects to them:

(A) the statement that all of Osborn's allegations with regard to Title VII are discrete acts and occurred more than 300 days prior to filing the charge (R&R p. 6-7)

(B) the statement that Osborn has not produced evidence that shows that CSC knew she was being paid incorrectly or that they showed "reckless disregard" as to whether the conduct was prohibited by FLSA (R&R p. 7)

(C) the statement that the 2 year statute of limitations should apply and any acts of discrimination occurring prior to 2/19/2002 are time barred (R&R p. 7-8)

(D) the statement that Osborn failed to make a prima facie case of discrimination (R&R p. 9)

(E) the statement that Osborn did not engage in protected activity (R&R p. 10)

(F) the statement that Osborn did not create an issue of material fact through Stafford's testimony regarding the  typo (R&R p. 16-17); and

G) the statement that Osborn has not raised a genuine issue of material fact as to whether she was paid less than her male colleagues (R&R p. 23).

5.     The recommendation that the District Court deny Plaintiff's motion for leave to amend is erroneous because Mrs. Osborn's filings with the Equal Employment Opportunity Commission ("EEOC") that provided the EEOC with the factual basis for her Title VII claims contained not only the bare EEOC "Charge of Discrimination" referenced in the Report and Recommendation, but also a much more detailed 6-page written "Statement of Deborah Osborn" ("the Statement"). *See* Exh. J, a copy of the Statement.  The Statement provided the EEOC ample facts to support not only a disparate treatment claim, but an adverse impact claim as well.  *See, Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), the seminal case establishing the framework for Title VII discrimination claims based on adverse impact theory in which purportedly objective criteria are found to be unlawfully discriminatory because they have an "adverse impact" on members of a protected group.  In this instance any specific criteria used for selection of Mrs. Osborn for dismissal in the RIF were not disclosed to her until well after the filing of this lawsuit, and therefore could not possibly have been the substance of any submission to EEOC.  However, the adverse impact CSC's selection criteria had on the only female senior sales representative in its Property and Casualty group was apparent from Plaintiff's Statement filed with EEOC and therefore was clearly within the scope of her administrative complaint of discrimination.

Wherefore, premises considered, Plaintiff Deborah Osborn prays that the Court deny the Defendants' motion for summary judgment, grant Plaintiff's motion for leave to amend, and set this case for jury trial at the earliest date available following the final pretrial conference set for September 23, 2005.

Respectfully submitted,

BY _____

Stephen Greenberg, Texas State Bar No. 08390100
Joe Edward Lea, Jr., Texas State Bar No. 12082000
Michael E. Lovins, Texas State Bar No. 24032555

Stephen Greenberg, Attorney at Law
Texas State Bar No. 08390100
2111 Dickson Dr., Suite 32
Austin, Texas 78704
        Phone: 512 / 447-2900
        Fax: 512 / 447-2901
Email: < greenberg_stephen@hotmail.com >

Joe Edward Lea, Jr., Texas State Bar No. 12082000
Michael E. Lovins, Texas State Bar No. 24032555
MCGINNIS, LOCHRIDGE & KILGORE, LLP
919 Congress Avenue, Suite 1300
Austin, Texas 78701
        Phone: 512 / 495-6000
        Fax: 512 / 505-6365
Email: < jlea@mcginnislaw.com >
        < mlovins@mcginnislaw.com >

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served by certified mail, return receipt requested, upon counsel for Defendants, Kevin Sadler and Allison Bowers, Baker Botts, LLP, 1500 San Jacinto Center, 98 San Jacinto Blvd., Austin, Texas 78701, on August 1, 2005.

Stephen Greenberg
Joe Edward Lea, Jr.
Michael Lovins

**Plaintiff's Objections to Report and Recommendation -- Page 10**

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

## NOTICE OF DOCUMENT(S) NOT IMAGED
## AND CONTAINED IN FOLDER

Civil Case No.          A-04-CA-158-LY

Deborah Osborn

VS.

Computer Sciences Corporation, et al.

Attachments to
Document #:          59

Description:          exhibits to objections to R&R

Filed By:          pltf

File Date:          8/1/05

_____
DEPUTY CLERK